UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>RAPHAEL TURNER II,<br><br>  Defendant. | Case No. 23-20284<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING MOTION TO SUPPRESS [36]**

During a routine stop at a gas station convenience store, two Detroit police officers saw a heavy bulge in Raphael Turner's sweatshirt pocket and thought Turner was acting suspiciously. When they asked Turner if he had a gun, he gestured in a way the officers interpreted to mean "no." But one of the officers eventually saw the handle of a gun through the opening in Turner's pocket. That officer grabbed Turner's arm and, when Turner resisted, handcuffed and arrested him. Turner was later charged in federal court with being a felon in possession of a firearm and released on bond pending trial.

A few months later, Turner was again arrested for carrying a concealed weapon. This time, Turner was walking in the street late at night, and as officers approached him, they noticed part of a holster and the shape of a pistol under Turner's shirt. Turner fled. After apprehending him in his garage, officers found a pistol in his waistband.

Eventually, Turner was charged in a superseding indictment with two counts of being a felon in possession of a firearm. Turner now seeks to suppress the guns seized from him as fruits of unlawful seizures. (ECF No. 36.) The government opposed the motion (ECF No. 38), and the Court held an evidentiary hearing on June 20, 2024.

Because the officers had reasonable and articulable suspicion that Turner was violating the law both times they detained him, the motions are DENIED.

## I.

### A. May 3, 2023

On May 3, 2023, Detroit police officers Kijuan Anderson and Lorenzo Palmer stopped at a Citgo gas station near the corner of Wyoming Avenue and Joy Road. (ECF No. 36, PageID.83; ECF No. 38, PageID.96.) The officers testified at the evidentiary hearing that they were conducting a "special attention" at the gas station—a common patrol at "green light" locations, that is, locations with surveillance cameras directly monitored by the police station.

As they entered the station's convenience store, Anderson and Palmer noticed Turner standing at the checkout counter and talking on the phone. (ECF No. 36, PageID.83–84.) Turner noticed the officers, too. Turner's back was to the officers as they entered (*id.*), but Anderson testified that Turner turned to look at him, paused his transaction, and stopped speaking on the phone. The cashier, Anderson recalled, looked at Turner and at the officers, as if she were confused by the sudden pause. To Anderson, Turner appeared "nervous" or "startled," which he found unusual because of how common police presence was at this green light location.

The officers testified that they also saw "an unusually heavy object in the front pocket" of Turner's sweatshirt, which they believed was a firearm based on their experience and training and "based on the weight and shape of the bulge." (ECF No. 38, PageID.96–97.) Anderson testified that he saw this bulge "immediately" upon entering the store.

For his part, Turner recalled that Anderson's eyes "never left" him after the officers entered the store. (ECF No. 36, PageID.84.) Turner said Palmer "gazed" at him while walking past, walked "to the far right side of the store," then "circled back" to him. (*Id.*) Meanwhile, Anderson remained in the doorway, "blocking the . . . way of [the] door," and began talking to Turner. (*Id.*) When Palmer returned to the front counter, the two officers were on either side of Turner. (*Id.*; ECF No. 38, PageID.97.)

The surveillance video from the store (Gov't Video Ex. 1) showed Turner entering the store and the officers talking with him about a minute later. (ECF No. 38, PageID.97.) As the government pointed out, it depicts the bulge in Turner's pocket[1] and Anderson pointing toward Turner's pocket:

---

[1] Notably, though, the left image was taken before the officers arrived at the gas station. It does not reflect the vantage point of the officers as they entered the store. But Anderson testified it did accurately reflect what he saw when Turner turned to face him.

3

 

(*Id.*)

This bulge, along with Turner's "nervous gestures," led the officers to suspect Turner was "illegally carrying a concealed weapon." (*Id.*) Anderson testified that he told his partner "fourteen"—a code meaning that he believed Turner was armed. Palmer testified that he nodded to Anderson, indicating he agreed with that assessment. So Anderson asked Turner if he was armed. (ECF No. 36, PageID.84; ECF No. 38, PageID.96.) At this question, Turner turned to face Anderson and respond. Anderson saw something new—not just a "heavy bulge" but an "outline resembling a handgun." That outline, testified Anderson, was "absolutely not" consistent with an object like a cellphone or keys, which would lay flat against the body. This object was L-shaped and was weighting the pocket forward, as a handgun

4

would. Also, Turner "responded [to Anderson's question] by lifting his shorts, in a gesture the officers interpreted as a denial that he had a weapon." (ECF No. 38, PageID.96.) Both officers testified that Turner was patting his pants pockets and legs but avoided touching the pocket of his hoodie, where they believed the gun to be. At that point, Palmer approached Turner's side. Palmer testified he could see the handle of a handgun "clear as day" inside Turner's sweatshirt pocket.

But Turner claimed the officers did not see the gun just yet. (ECF No. 36, PageID.84.) As Turner tried to walk away, Palmer grabbed his right arm. (*Id.*; ECF No. 38, PageID.97.) Palmer testified that because he had seen the gun, he wanted to restrain Turner to ensure the officers' safety. And Turner was pulling away, according to the officers. (ECF No. 38, PageID.97.) But according to Turner, Palmer "held [his arm] firmly" and "started pulling" to prevent him from moving. (ECF No. 36, PageID.84.) Turner claimed this was the moment, when his arm was being pulled and his hoodie shifted, that his pocket opening was exposed and the officers first saw the gun. (*Id.*) But the surveillance video supports the officers' testimony about their vantage points and thus the Court has no reason to disbelieve their testimony about when they saw the gun.

Anderson then restrained Turner as Palmer retrieved the gun from Turner's pocket. They took Turner to the ground and placed him in handcuffs.

Turner did not produce or advise the officers that he had a concealed pistol license. At some point, Palmer confirmed that Turner did not have such a license. He testified that he ran Turner's information through the Law Enforcement Information

Network but could not remember whether he did so at the scene or while they were en route to the police station.

Two days later, Turner was charged in this Court with being a felon in possession of a firearm. (ECF No. 1.) Soon after, he was released on bond pending trial. (ECF No. 11.)

### B. October 24, 2023

About five months later, while still on pretrial release, Turner was again arrested for carrying a concealed weapon. (ECF No. 38, PageID.98.)

On October 24, 2023, just before midnight, Turner claims he was on his front yard simply observing others in the neighborhood. (ECF No. 36-1, PageID.90.) However, DPD officers Xavier Dolly and Austin Bochar, who were on patrol in the area, say they observed Turner walking in the street of this neighborhood where sidewalks were provided—a civil infraction under Michigan law. (ECF No. 38, PageID.99); *see* Mich. Comp. Laws § 257.655(a).

So the officers approached Turner in their patrol car to investigate the infraction. (ECF No. 38, PageID.99.) They both testified that they saw a belt clip in Turner's waistband, which they recognized as part of an inside-the-waistband holster based on their training and experience. (*Id.*) Through Turner's t-shirt, they also allegedly saw a bulge that "appeared to be the handle of a pistol" just above the holster clip. (*Id.*) As they got closer, the officers observed Turner look toward their car, turn or "blade" his body away from the car, put his arm in front of the holster, and then begin to walk away. (*Id.*)

6

At that point, the officers suspected that Turner was carrying a concealed weapon. (*Id.*) So Bochar got out of the car and asked Turner to come over. Turner took off running. (*Id.*) Dolly also got out of the car and followed Bochar in pursuit. Despite the officers' multiple orders to stop, Turner continued running toward a nearby garage. (*Id.*)

Eventually, the officers caught up with Turner in the garage. (Gov't Video Ex. 5.) Dolly took Turner to the ground and told him to place his hands behind his back. Bochar testified that Turner did not comply with this order, and in fact began reaching for his waist in the area of the holster. Dolly testified that as he took Turner to the ground, he grabbed Turner's waist and felt what he believed was a pistol near where the officers had observed the bulge and holster clip. While on the ground, Turner continued to struggle and ignore Dolly's commands to "stop." Dolly testified that Turner used his legs to "clutch" the weapon and prevent the officers from retrieving it. Dolly further testified that at one point Turner successfully grabbed the weapon with his hand. So Dolly tased Turner and "arced" the taser—that is, sent an electrical current to the probes—three times.

Turner finally released his legs and the officers were able to recover a pistol and an inside-the-waistband holster from Turner's waist. This pistol formed the basis for the second felon-in-possession charge in Turner's indictment. (ECF No. 27, PageID.54.)

### C. Turner's motions to suppress

Turner moves to suppress both firearms seized during these incidents. (ECF No. 36.) He argues that the officers violated his Fourth Amendment rights because they lacked reasonable suspicion to conduct the investigative *Terry* stops. (*Id.* at PageID.84; ECF No. 36-1, PageID.91.) Thus, says Turner, the evidence that flowed from these stops is "fruit of the poisonous tree" and must be suppressed. (ECF No. 36, PageID.86; ECF No. 36-1, PageID.92); *see Brown v. Illinois*, 422 U.S. 590, 603 (1975).

Based on the evidence presented at the evidentiary hearing and the governing law, the Court disagrees.

### II.

Before addressing the parties' positions, a brief summary of Fourth Amendment law is helpful.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Interactions between the public and police officers fall into three categories: 'consensual encounters in which contact is initiated by a police officer . . . ; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" *See United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) (quoting *United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007)); *see also Terry v. Ohio*, 392 U.S. 1 (1968). A person is "seized" within the meaning of the Fourth Amendment when a consensual encounter with a police officer becomes a so-called *Terry* stop. As such, it

is at that point that "the police officer must have a reasonable suspicion of criminal activity" to justify the stop. *Lewis*, 843 F. App'x at 688 (citing *Campbell*, 486 F.3d at 953–54).

To determine whether an officer "seized" an individual, the Court must evaluate whether the officer "restrain[ed] the person's freedom of movement by means of physical force or a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Put differently, the Court asks whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Johnson* (*Johnson 2010*), 620 F.3d 685, 690 (6th Cir. 2010). By contrast, a person is not seized merely "because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

"Determining when a person has submitted to police authority is an objective inquiry that takes into account all the facts and circumstances of the stop." *United States v. Johnson* (*Johnson 2015*), 631 F. App'x 299, 302 (6th Cir. 2015). To guide this circumstances-based inquiry, the Supreme Court has identified some factors that may indicate a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. The Sixth Circuit has elaborated on these factors, providing that "the purpose of the questioning," "whether the place of questioning was hostile or coercive," "the length of questioning," and "other indicia of

9

custody such as . . . whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police" could indicate whether a reasonable person would feel they are free to leave. *See Lewis*, 843 F. App'x at 688–89 (citing *United Sates v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)).

### III.

With this background, the Court begins with the May 3, 2023, encounter at the gas station convenience store. The Court must first pinpoint the moment Turner was seized, then evaluate whether the officers had reasonable and articulable suspicion for that seizure.

Turner claims that "[i]mmediately upon entering the store[,] Officer Anderson . . . start[ed] the custodial interrogation" and that he was "physically detained" when Anderson blocked the exit to the store. (ECF No. 36, PageID.84–85.) Palmer testified that once Turner turned and he saw the weapon in Turner's pocket, he would not have let Turner leave unless he presented a concealed pistol license. Anderson testified that as soon as Turner faced him, he saw the gun, and as soon as he and Palmer had Turner surrounded, Turner was "seized."

But recall, seizure is an "objective inquiry." *Johnson 2015*, 631 F. App'x at 302. The officers' perceptions of seizure, and whether they would have let Turner leave, are relevant to the inquiry "only to the extent that that intent has been conveyed to the person confronted." *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988). The Court must evaluate "all of the circumstances surrounding the incident" and

10

determine whether "a reasonable person would have believed that he was not free to leave"—not whether Turner was actually free to leave. *Johnson 2010*, 620 F.3d at 690.

In so doing, the Court agrees with Anderson that Turner was seized when he was surrounded by the two officers.

Contrary to Turner's argument, Turner was not seized immediately upon the officers entering the store. Palmer had his back to Turner, and Anderson was casually standing in the doorway.



(Gov't Video Ex. 1, 7:24.) They had not even spoken to Turner. A reasonable person would still have felt free to leave at this point.

Anderson then looked Turner up and down, said something to Palmer (presumably "fourteen," as Anderson testified), and pointed at Turner's pocket.

11



(*Id.* at 7:28.) The two officers then converged on Turner.



(*Id.* at 7:32.)

Turner backed away from the counter, and Anderson and Palmer moved with him—Anderson stepping in front of the door and blocking his path, and Palmer stepping toward Turner with his hand on his weapon.



(*Id.* at 7:39.) It was at this point that Turner was seized.

Officers "can position themselves immediately beside and in front of a suspect and even reach across a suspect" without this constituting a seizure, "provided they leave a way out." *United States v. Smith*, 594 F.3d 530, 538 (6th Cir. 2010); *see also United States v. Fonville*, 127 F. Supp. 3d 790, 796 (E.D. Mich. 2015) ("[An individual] is not seized even when he is approached by more than one uniformed officer, or questioned by uniformed officers surrounding him on both sides." (citations omitted)). When the officers were surrounding Turner at the counter, they still left him room to get to the door. However, when Turner moved away from the counter, Anderson

13

blocked his exit and Palmer placed a hand on his weapon as he approached. This would signal to a reasonable person that he was not free to leave.

Having narrowed down the point of seizure, the Court now evaluates whether the officers had reasonable and articulable suspicion for this seizure. It finds that they did.

"*Terry* . . . permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *See United States v. Davis*, 514 F.3d 596, 607–08 (6th Cir. 2008). "Reasonable suspicion consists of more than a mere hunch, but 'is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Lewis*, 843 F. App'x at 690 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). An officer's suspicion must be based on both "specific, objective facts" and the "totality of the circumstances in place at the time of seizure." *Id.* (citations omitted). An officer may rely on his training and experience to "make inferences from and deductions about" the circumstances he observes. *Id.* (citations omitted).

Here, the officers' seizure of Turner was justified based on the multiple indicators of criminal activity they observed.

Anderson testified that he noticed the bulge "immediately" upon entering the store. The video corroborates this testimony, showing Anderson walking in, pausing in the doorway, looking Turner up and down, and pointing at his hoodie pocket. (Gov't Video Ex. 1, 7:21–7:30.) Anderson also testified that Turner paused during the

14

transaction and stopped speaking on the phone, which he thought was suspicious. And before asking Turner any questions, Anderson testified that he indicated to Palmer that he suspected Turner might be armed, using the code word "fourteen," further corroborating that he saw the bulge immediately. This alone gave the officers reasonable suspicion to conduct a *Terry* stop.

But there was more. When Anderson asked Turner if he was armed, Turner turned to face Anderson and patted down his legs but conspicuously avoided patting his hoodie pocket. And once Turner was facing him, Anderson saw the outline of what he believed was a gun. Palmer even testified that he saw the actual handle of the gun.

An officer's observation of an "imprint" of a firearm has been held sufficient to establish reasonable suspicion. *See United States v. Capozzoli*, No. 22-20005, 2022 WL 3044818, at *1, 5 (E.D. Mich. Aug. 2, 2022) ("Officer Vansickle communicated that it appeared Defendant had the imprint of a pistol on his right side. . . . Having *seen* a concealed weapon, the officers had reasonable suspicion to investigate whether Defendant in fact had a firearm on his person, including by approaching him and asking Defendant questions.").

Likewise, the Court breaks no new ground by concluding that the imprint, combined with Turner's suspicious behavior, reasonably indicated to the officers that Turner was concealing a firearm. *See, e.g.*, *Lewis*, 843 F. App'x at 691; *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer."); *United States v. Stennis*, 457 F. App'x 494, 500 (6th Cir. 2012)

15

(finding reasonable suspicion where "Officer Roncska brusquely asked Stennis if he had anything 'in there' while indicating Stennis' waist area and quickly initiated the search. Coupled with the testimony Officer Roncska provided at the hearing, we find that the district court did not err in crediting Officer Roncska's testimony that he observed a suspicious bulge in Stennis' pants"); *United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014) ("The officer's belief, based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provides 'reasonable suspicion' under the *Terry* doctrine that the defendant was carrying a concealed pistol.").

The officers interpreted Turner's patting of his body as a denial that he was armed. So, based on their observations of the gun, they believed Turner was armed and was lying about not being armed. Further, Turner did not present a concealed pistol license. The officers testified that in their experience, if a person had a CPL, they would produce it upon police questioning.

And having reasonable suspicion that Turner had a firearm—and failed to produce a CPL—provided a reasonable basis to conclude he was involved in criminal activity. Michigan law makes it unlawful to "carry a pistol concealed on or about [one's] person . . . without a license to carry the pistol as provided by law." Mich. Comp. Laws § 750.227(2). A person must have a CPL with him "at all times he . . . is carrying a concealed pistol" and must "show" the license "upon request" by a police officer. Mich. Comp. Laws § 28.425(f).

So having concluded that Turner had a firearm based on the imprint of the object and a view of the handle, and Turner having seemingly lied about being armed, the officers had reasonable suspicion to detain Turner in order to investigate whether Turner was illegally carrying a concealed weapon. *See United States v. Bridges*, No. 16-20089, 2016 WL 3922354, at *6 (E.D. Mich. July 21, 2016) ("When the police officers saw the outline of a gun in the defendant's pocket, it was proper, under Michigan law, to inquire whether the defendant was in possession of a concealed carry license. The failure to produce the license supported the conclusion that the defendant was committing a felony."); *United States v. Patterson*, No. 22-20269, 2023 WL 4290051, at *4 (E.D. Mich. June 30, 2023) ("[The officer] stated that he observed an L-shaped object in the left pocket that, in his experience, was consistent with the size and shape of a firearm. He also testified that the left pocket of [defendant's] sweatshirt was weighed down, which suggested that there was a somewhat heavy L-shaped object in that pocket. [The officer and defendant] made eye contact as [defendant] exited the gas station, after which [his] body movement changed. [Defendant] stiffened his left arm and held it closer to the left side of his body, over the left pocket, and he 'bladed' away so that the left side of his body was out of [officer's] view. . . . With these observations and conclusions drawn by [the officer's] experience, [the officer] had reasonable suspicion that [defendant] was carrying a concealed weapon without a license, and he was, therefore, justified in conducting a stop to investigate whether [defendant] was engaged in criminal activity.").

17

In sum, the Court disagrees with Turner that the officers lacked reasonable suspicion. The officers' articulable observations provided a reasonable basis to conclude that Turner was unlicensed with a concealed firearm on his person. Thus, the Court will not suppress the firearm recovered on May 3, 2023.

## IV.

That leaves the gun seized during the October 24, 2023, arrest. It will not be suppressed either, as the officers had numerous reasons to conduct an investigatory stop of Turner.

First, they observed Turner walking in the roadway where sidewalks were provided. This is a civil infraction under Michigan law. *See* Mich. Comp. Laws § 257.655(2). And police may effect a stop if they have probable cause to believe a person committed a civil infraction. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).

Second, while Turner was walking in the roadway, the officers observed a holster in his waistband, holding what appeared to be a handgun. As already discussed, it is a presumptive felony in Michigan to carry a concealed weapon. *See* Mich. Comp. Laws § 750.227(2); *People v. Williams*, No. 365299, 2024 WL 1684856, at *2 (Mich. Ct. App. Apr. 18, 2024) ("Evidence that a defendant placed a revolver in his belt or waistband so that the weapon could not be readily seen has been found sufficient to uphold a CCW [carrying a concealed weapon] conviction."). Thus, "under Michigan law a police officer has reasonable suspicion to approach a person and ask

18

for proof of a CPL after observing a bulge in a person's clothing indicative of a hidden firearm." *Williams*, 2024 WL 1684856, at *8.

Third, Turner turned or "bladed" his body at the sight of the police car and placed his hand in front of the holster. This further added to the officers' suspicions that Turner was illegally carrying a concealed weapon. *See e.g.*, *United States v. Costner*, No. 23-20110, 2023 WL 4932083, at *5 (E.D. Mich. Aug. 2, 2023) (finding that police had reasonable suspicion to stop a suspect after observing an "imprint" of a gun in his pocket and seeing the suspect "grab[] over the pocket" and "blade[] his body" away from the officers when they asked if he had a CPL). Indeed, Dolly testified he found the movement suspicious, because "if you were not carrying a weapon illegally" you would not "have any problem" with an officer seeing that weapon.

Fourth, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. Thus, "[u]nprovoked flight gives a police officer reasonable suspicion under *Terry* to give chase, stop the suspect, and conduct a protective patdown for weapons." *United States v. Ray*, 597 F. App'x 832, 838 (6th Cir. 2015) (citing *Wardlaw*, 528 U.S. at 124–26); *see also United States v. Jeter*, 721 F.3d 746, 755 (6th Cir. 2013) ("There are innocent reasons to flee, but *Terry* permits 'officers [to] detain the individuals to resolve the ambiguity.'").

Finally, Turner ignored the officers' lawful commands to stop. "An individual who . . . knowing[ly] fail[s] to comply with a lawful command . . . is guilty of a felony" under Michigan law. Mich. Comp. Laws § 750.81D. The officers commanded Turner

to stop after they got out of the car, meaning they commanded him to stop after they had seen a holster and a suspicious bulge. Turner's subsequent flight gave the officers further reasonable suspicion (and even probable cause) that Turner was committing a crime.

In short, the officers had probable cause to stop Turner for a civil infraction and reasonable suspicion to stop him for carrying a concealed weapon. And "[b]ecause officers [also] had reasonable suspicion to stop [Turner] once he fled, [Turner] was legally seized, and the gun found in his possession was not fruit of the poisonous tree." *Jeter*, 721 F.3d at 755; *see also Williams v. United States*, 632 F. App'x 816, 823 (6th Cir. 2015) ("[I]f officers have reasonable suspicion of criminal activity, and the suspect flees when the officers attempt to stop him, the officers' reasonable suspicion ripens into probable cause." (citing *United States v. Dotson*, 49 F.3d 227, 230, 231 (6th Cir. 1995))).[2]

## V.

For the foregoing reasons, Turner's motions to suppress (ECF Nos. 36, 36-1) are DENIED.

SO ORDERED.

Dated: July 1, 2024  s/Laurie J. Michelson
  LAURIE J. MICHELSON
  UNITED STATES DISTRICT JUDGE

---

[2] It does not matter that Turner was ultimately seized in his garage. *See, e.g.*, *Kentucky v. King*, 565 U.S. 452, 460 (2011) ("Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect"); *Smith v. Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013) ("Under the hot pursuit exception, an officer may chase a suspect into a private home when the criminal has fled from a public place.").